**Julian SHERRIER, Plaintiff,**

v.

**Bernice RICHARD, Defendant.**

**No. 82 Civ. 3723 (RWS).**

United States District Court,
S.D. New York.

May 22, 1986.

Greenfield, Eisenberg, Stein & Senior, New York City, for plaintiff; Norman A. Senior, Gary B. Freidman, of counsel.

Brown & Seymour, New York City, for defendant; Whitney North Seymour, Jr., Claude P. Bordwine, of counsel.

SWEET, District Judge.

A factual hearing was held on February 26, 1986 to determine certain factual issues raised by the motion of defendant Bernice Richard ("Richard") to vacate the judgment

in this action on the basis of fraud, misrepresentation or other misconduct. Fed.R. Civ.P. 60(b)(3). Plaintiff Julian Sherrier ("Sherrier") has brought a cross-motion seeking amendment of the judgment. The circumstances leading up to these motions are set forth in this court's opinion of December 19, 1985, 624 F.Supp. 918. For the following reasons both motions will be denied.

**Facts**

The factual hearing focused on signatures purported to be of Mohammed Siddick ("Siddick") found on two documents that were introduced as exhibits at trial. Richard produced four expert witnesses at the hearing who compared these signatures (the "questioned signatures") to those signatures of Siddick which were executed before the High Court of Peshawar, Pakistan in connection with Siddick's response to letters rogatory (the "known signatures"). These experts each testified that the questioned signatures on Exhibits 15 and 15A were not written by the same person who executed the letters rogatory. In sum, the experts noted that the known signatures were written with a flowing curved style in which the combinations of letters were written in a series of descending movements following a consistent base line and upper line. The diacritical markings in the known signatures were precisely placed one above the other. On the other hand, the questioned signatures were characterized as angular and erratic, written with a poor quality of pen control. The base line of the questioned signatures was slanted rather than consistently level and the letter formations were extended above and below the base line to a significantly greater extent than did the known signatures. Finally, the experts demonstrated marked differences in the formation and shape of particular letters.

The expert called on behalf of Sherrier only partially rebutted the testimony of Richard's experts. While stating that certain of the letter foundations were similar, Sherrier's expert also recognized that the two questioned signatures were not written

fluently but rather were marked by a strong hesitation in forming the characters. On cross-examination, he also noted the difference between the round forms of the known signatures as compared to the angular features of the questioned signatures but stated that these differences could be attributed to disparities in the person's mental or physical capabilities resulting from factors such as intoxication or drug use at the time the questioned signatures were executed. Finally, Sherrier's expert hypothesized that the hesitation found in the questioned signatures was possibly due to an attempt to disguise the true handwriting of the person.

Based on the expert testimony presented, Richard has established that Siddick did not sign Exhibits 15 and 15A. It is necessary, therefore, to consider the consequences of this new finding for the judgment rendered three years ago.

Exhibits 15 and 15A were documents obtained at the request of Sherrier for the purpose of confirming his purchases of sculpture and other business dealings with Siddick. Exhibit 15 and the accompanying invoices were said to have been prepared in 1980 at the time Sherrier and Richard were attempting to resolve their differences and after Richard had requested confirmation of the disputed transactions. Exhibit 15A was prepared after the litigation in this court had commenced. Sherrier's counsel explained that in anticipation of the injunctive hearing, he requested Sherrier to get whatever documentation that would verify his claims and that Sherrier telephoned Bedar Shah in Pakistan to request him to obtain further evidence of the transactions between Sherrier and Siddick. Citing the distinctive wording of Exhibit 15A; its similarity to Sherrier's deposition testimony; the possible similarity of the style of signature to that of Sherrier's handwriting and the use of a typewriter with a dollar symbol, Richard contends that Sherrier might have prepared and signed Exhibit 15A himself and then sent it to Pakistan for notarization with the intent to create a forgery for presentation into evidence.

These threads of evidence, however, fail to establish that Sherrier has perpetrated a fraud upon the court. Indeed, it is possible that Siddick was the only person responsible for his forged signature as a means of avoiding attesting to a document setting forth illegal conduct. *Compare Associates Discount Corp. v. Goldman*, 52 F.R.D. 37, 40 (W.D.Pa.1971) (allegation of forgery, if substantiated, would support claim of fraud under Rule 60(b)(3) since the signature was attested to by an employee of the adverse party as a subscribing witness).

The other link between the forged documents and Sherrier is that Sherrier established whatever foundation there was for their admissibility by testifying that he was familiar with Siddick's signature because he had seen it on invoices in Siddick's office in Peshawar and that to the best of his knowledge the signature was that of Siddick. Recognizing the equivocal basis on which the identification of Siddick's signature was based, the court at trial expressed its real "real reservations" about the authenticity of the documents. Nevertheless, they were admitted under an expansive interpretation of the Federal Rules of evidence which the court deemed appropriate in the context of a bench trial. This decision regarding the admissibility of the documents has now proven to be in error. Therefore, the implications of this error will be considered even though there has not been a sufficient showing that Sherrier intentionally misrepresented the authenticity of Siddick's signatures.

### Siddick's Participation in the Pakistan Transactions

The first issue raised by Richard contests the very participation of Siddick in the transactions at issue in this case, claiming that Sherrier falsely testified about his dealings with Siddick. In his responses to post-trial interrogatories, Siddick categorically denied ever meeting with Sherrier or transacting any business with him. In addition, Richard notes the testimony of William Wolff an art dealer who travelled to Peshawar during the period in question to purchase Gandharan art, using the same intermediary as did by Sherrier. Wolff testified that the only local dealer who he met on this trip to Peshawar was a man by the name of Sadar Khan, that he was never introduced to Siddick and that he was shown the Seated Buddha in the home of Khan on June 3, 1979. According to his testimony, Sherrier purchased this same piece from Siddick during his 1979 trip to Pakistan. Finally, Wolff testified that in his conversations with Sherrier regarding Gandharan art dealers, he never recalled Sherrier mentioning Siddick's name.

Siddick's own denials of his relationship with Sherrier are of little or no probative value, since it has been established that the transactions at issue are illegal under the law of Pakistan and given the severe penalties attendant to such crimes, a Pakistan dealer would be loath to admit to them. Moreover, Sherrier has demonstrated a bank transfer of funds to Siddick in 1982, and has produced the declaration of a money lender, Shiraz Gul, who independently confirms the transactions between Sherrier, Shah and Siddick in 1980.[1] On balance, given Sherrier's sworn testimony which was not completely relied upon, Siddick existed and had a relationship with Sherrier. Of course, his existence is less material than the monetary questions which would be raised if he had not existed.

### The Methods of Payment

Richard's attack on Sherrier's testimony includes the method of payment for Gandharan art objects and its concomitant effect on the transactions with which she and Sherrier were involved. Wolff testified that although the local dealers always requested cash, he insisted paying by check so that he would obtain a record of the transaction. Sherrier stated that it was customary to pay cash for sculpture and

---

1. There is no indication why this document was not produced at trial, but given the favorable inferences which it contains, it is unlikely that Sherrier withheld it intentionally. The only as- pect of the transactions which are unsupported by the Gul letter is the ransom demand which was also rejected at trial.

that the local dealers generally refused to issue receipts. In addition, however, he also testified that it is possible to pay by check with the payee's name left in blank, the means by which Wolff made his purchases. The fact that Sherrier paid cash and Wolff by check does not establish that Sherrier did not make the payments he claimed to have made for the Buddhas at issue.

### The Value of the Buddhas

The central contention of Richard's motion for a new trial is that Sherrier's testimony was false in that Siddick did not exist, the payments were unverified and therefore she concludes that the purchase prices of the four Buddhas was overstated and that Sherrier used some of Richard's funds to purchase other art objects for which there should be a further accounting. Wolff's testimony was principally relied upon by the court to confirm the price paid by Sherrier for the Buddhas, and Richard now contends that this testimony was fraught with mistake.

Wolff confirmed at trial that a purchase price of $160,000 would have been a good price for the Standing and Seated Buddhas in 1979. He then testified with regard to the 1980 purchases of the Princely and Elongated Buddhas that it would have been impossible to purchase the two together for $150,000. Instead, he asserted that each one of them would have cost between $125,000 and $150,000 to purchase in Peshawar. He further testified that he was offered the Princely Buddha for $200,000 in Karachi during 1980.

In a post-trial deposition now relied upon by Richard, Wolff stated that he was mistaken about having seen the Princely Buddha in Karachi for the piece he saw was broken on the ankles while the Princely Buddha was intact. In pursuing this issue, Wolff indicated that the statue which he was shown in Karachi for an asking price of $200,000 was not as good as others he had previously purchased for $100,000 to $40,000. Finally, he concluded that he was unable to recall whether the Princely Buddha to which he testified at trial was more or less valuable than the Buddha seen in Karachi.

While this post-trial evidence indicates a mistaken belief by Wolff during his trial testimony, it does not overturn any of his expert testimony on the issue of the 1980 purchase prices for the Elongated and Princely Buddhas. Wolff's estimates of the Princely Buddha's price did not track the $20,000 asking price in Karachi but rather was based on the much lower estimate of $125,000 to $150,000. This lower estimate is in keeping with his post-trial testimony regarding his own purchases. Furthermore, since Wolff testified at trial that the Elongated Buddha was a more interesting piece than the Princely Buddha, his post-trial estimate of a $100,000 to $110,000 purchase price for a Buddha similar to the Princely Buddha would not upset a conclusion that the Elongated and Princely Buddhas were purchased by Sherrier for $250,000 and that to purchase both for $150,000 would have been impossible. Therefore, Richard has adduced no new evidence that would controvert the findings at trial regarding the purchase prices of the Buddhas other than the circumstantial evidence already considered.

### Other Alleged Purchases

The record, as supplemented through post-trial discovery and the cognizance of the forged exhibits, continues to support the findings in the trial opinion regarding the prices paid for the Gandharan Buddhas and thus undermines any inferences drawn by Richard regarding the use of her funds towards the purchase of other art objects during 1980. An examination of the new evidence proffered by Richard indicates that there is insufficient evidence of Sherrier's ownership interests in these objects.

With regard to the silver collection, Sherrier testified at trial that he brought the collection to the United States on consignment with the understanding that if unable to sell the collection within a specified time, it would be returned. Sherrier testified that the silver was returned in 1980. Richard now claims to have established evi-

dence that Sherrier in fact possessed an ownership interest in the silver.

First, she suggests that Sherrier testified falsely about returning the collection. However, the evidence of additional photographs being ordered by Sherrier in 1981 does not establish his ownership of the pieces. In addition, the post-trial testimony of Jerome Eisenberg, a dealer with whom Sherrier exhibited the collection in New York, is singularly inconclusive about the status of the collection. Eisenberg did not state that Sherrier ever indicated any ownership interest in the silver collection but indicated that both Sherrier and Shah were acting as agents in the sale of the collection. While Eisenberg's testimony indicates that Sherrier had a continuing interest in marketing the silver collection after 1980, this testimony does not establish Sherrier's ownership of the collection nor does it establish that Sherrier testified falsely about returning the collection to Pakistan in 1980. Sherrier's activities in connection with the restoration of the silver · in 1984 are similarly speculative regarding the owner of that collection.

Richard has pointed to several other items, as she did at trial, which were allegedly purchased by Sherrier with her funds. The Garuda group was allegedly purchased in 1979 with Richard's money, but that claim was dismissed at trial and post-trial evidence from Spinks in London tends to confirm that the piece was shown to one of the directors there as early as 1978. Similarly, the Spinks representative has confirmed that the Gwalior bust was taken by Sherrier on consignment from Spinks and was charged to his account in late 1980 at about the same time as Spinks accepted a piece from Sherrier. Finally, there is no indication on the present record to indicate Sherrier's purchase or ownership of two pieces referred to as the Six-Foot Standing Buddha and the Stylized Frieze of a Seated Buddha.[2]

### The Unavailability of Bedar Shah

Finally, Richard has asserted that Sherrier deliberately deceived the court as to the unavailability of Bedar Shah to testify as a witness on behalf of Sherrier. Sherrier explained at trial that Shah would have attended but for difficulties in obtaining the necessary travel papers. On the other hand, there are indications that Shah has travelled several times to the United States since 1981.

Nevertheless, even if the court were to draw an inference that Shah's testimony would be unfavorable to Sherrier's case, there is no basis to conclude that his absence constituted a fraud or otherwise requires a modification of the judgment. Wolff's testimony confirmed the existence of Shah as a broker in those Pakistan art objects and further conveyed the elusive and unpredictable manner in which meetings with the local brokers and dealers were arranged. The judgment cannot be overturned by speculation as to the substance of the testimony of an absent witness.

### The Alleged $50,000 Down Payment

In response to Richard's motion to vacate the judgment, Sherrier has cross-moved to modify the judgment by reinstating the alleged $50,000 down payment in the Standing and Seated Buddhas which was disallowed in the opinion of April 27, 1984. Sherrier, however, has adduced no new evidence in connection with this motion. His arguments regarding the unwillingness of Pakistani citizens to testify to the underlying transactions was considered and rejected in the light of the circumstances attendant to the alleged transaction with the Fancys described in the April, 1984 opinion. That other Pakistanis have also denied involvement with similar transactions does not require a further amendment of the judgment.

### Conclusions

As has previously been noted by the Court of Appeals in this action, a motion

---

**2.** Similarly, the oblique reference to "property" in the Gul letter of November, 1980, fails to establish any probative link between any of these pieces and the funds invested by Richard.

under Rule 60(b) is committed to the sound discretion of this court. *Sherrier v. Richard,* No. 84–7585 (2d Cir. December 3, 1984). *See also Atchison, Topeka & Santa Fe Ry. Co. v. Barrett,* 246 F.2d 846, 849 (9th Cir.1957). Richard's exhaustive reexamination of the basis for the judgment fails to persuade the court that the judgment was either unsound or predicated on the fraudulent conduct of Sherrier. A fraud upon the court exists where there was an "unconscionable plan or scheme which [was] designed to improperly influence the court in its decision." *England v. Doyle,* 281 F.2d 304, 309 (9th Cir.1960). Similarly, perjured testimony during a trial may establish fraud or misrepresentation within the meaning of Rule 60(b). *See Peacock Records, Inc. v. Checker Records, Inc.,* 365 F.2d 145 (7th Cir.1966).

 Richard's demonstration that the court erroneously admitted documents into evidence which were inadequately authenticated and later shown to be inauthentic does not lead ineluctably to the conclusion that Sherrier perpetrated a fraud upon the court. Sherrier's participation in the alleged fraud has not been convincingly established and a reconsideration of the evidence absent the forged exhibits has been conducted.

Richard has sought to draw broad inferences from circumstantial evidence surrounding transactions which were, by their very nature, kept in the dark by all parties involved. Moreover, as noted previously, this action was marred by the testimony of both Sherrier and Richard which lacked candor and reliability. Despite the analysis offered by Richard on this motion, the judgment rests on solid footings established at trial regarding the existence of a joint venture between the two principals and the validity of the prices paid as established by independent expert testimony. Given the skepticism with which the questioned documents were initially viewed by the court and the lack of weight which they carried in rendering the court's opinion, the demonstration of their inauthentic nature does little to disturb the court's findings.

For the foregoing reasons, both Richard's motion to vacate and Sherrier's motion to amend are hereby denied.

IT IS SO ORDERED.